# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
May 4, 2011 Session

## REBECCA GRIBBLE WADDELL v. GREGORY C. RUSTIN

**Appeal from the Chancery Court for Jefferson County**
**No. 08-102      Telford Forgety, Chancellor**

---

**No. E2010-02342-COA-R3-CV-FILED-JULY 7, 2011**

---

This case stems from a lawsuit over an alleged implied partnership. Rebecca Gribble Waddell ("Waddell") and Gregory C. Rustin ("Rustin") were involved romantically for a number of years. After the couple separated, Waddell sued Rustin in the Chancery Court for Jefferson County ("the Trial Court"), alleging, among other things, that a partnership existed between Waddell and Rustin. The Trial Court held, *inter alia*, that there was no partnership between Waddell and Rustin and ordered divestiture of certain property from Waddell to Rustin. Waddell appeals to this Court, and both parties raise multiple issues. Rustin also argues that this appeal is frivolous. We affirm the judgment of the Trial Court on all issues except for that concerning divestiture of certain property from Waddell, which we reverse. We decline to hold this appeal frivolous. We affirm, in part, and, reverse, in part.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery
Court Affirmed, in Part, and Reversed, in Part; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., and JOHN W. MCCLARTY, J.J., joined.

Beth Boniface, Morristown, Tennessee, for the appellant, Rebecca Gribble Waddell.

Ronald J. Attanasio, Knoxville, Tennessee, for the appellee, Gregory C. Rustin.

## OPINION

## Background

Waddell and Rustin entered into a romantic relationship soon after meeting in 1999. The parties dispute the precise nature of their ensuing association. Waddell maintains they had not only a personal relationship, but also a business partnership. Rustin claims they never were business partners.

Waddell has a son from a previous marriage. Waddell and Rustin have a daughter born in 2003. Around 2008, Waddell and Rustin separated. In June 2008, Waddell filed a petition against Rustin "seeking adjudication of her right, title and interest in and to certain real and personal property." Waddell alleged, among other things, that she and Rustin were partners who "undertook a union in lawful commerce or business and, by mutual agreement, placed their money, efforts, labor and skill in various business activities for profit." Rustin filed an answer and counter-complaint denying that any such partnership with Waddell existed.

This case was tried in August 2010. Waddell testified that when she met Rustin in 1999, he worked for Dillard Smith Construction and she worked at a convenience store.[1] The two began to date shortly thereafter. Rustin and his brother ran a business called Lots of Christmas ("the Store"). Waddell stated that she worked at a nursing home in 2000. Waddell later attended nursing school and obtained an LPN license.

Rustin's brother left the Store in 2000. Waddell testified to the consequences of the brother's departure from the Store:

Q. And when Mr. Rustin's brother left the partnership, did Mr. Rustin ever make any comments to you about the business?

A. Yes. His brother handled the day-to-day activities at the business. So that was his brother's primary job, was the business. And so after he left the business had been closed for quite a while and - - because Mr.

---

[1] Waddell's deposition is appended to Rustin's brief. Although a motion requesting that the Trial Court supplement the appellate record with the deposition is also appended to Rustin's brief, there is no evidence in the record of any ruling by the Trial Court on the motion or that the motion even was filed. Therefore, the deposition is not part of the record, and we will not discuss it further. We, however, have reviewed the deposition and note that its contents would not have altered our decision in this case in any event.

Rustin was still working with the construction company. And so we had sat down and talked about me keeping the store open. I was going to nursing school and so - - the store was closed all the time. So we just discussed, you know, anytime I could be there I would be there to help out with the store so we didn't have to shut it down.

Waddell testified to her work at the Store.

I would go in of the mornings, open the store up. If we had customers - - it pretty much depended on whether we had customers or not. If we had customers, I waited on the customers. I would paint the frames that - - we had Christmas frames. We would have to paint those. I would paint the frames, help light up the frames. I wasn't excellent at lighting the Christmas frames, so I would help light the frames. I would do some, but I wasn't very good at it. I would mow the grass, keep the books, keep checkbook, anything pretty much - - if stuff need[ed] to be delivered. If people purchased stuff that needed to be delivered, I would deliver it.

Waddell stated that she had access to the company checkbook. Waddell testified that she changed the Store's name from Lots of Christmas to Aluminum Decor and More because "that's what was selling in the market at that time." Waddell testified that she did not receive checks for her work. Waddell stated that she combined monies with Rustin.

Waddell testified that she and Rustin began a construction business in 2001, buying lots and constructing cabins and houses. Waddell testified regarding her contribution to the construction business:

It varied from cabin to cabin, from home to home. Some of the cabins, I didn't do anything. It was just the funds that we had made from the other cabin sales and the stores - - the store - - I'm sorry - - store that we had. And other homes. I done everything from going every day to cleaning up after the workers, to hanging the cabinets, the kitchen cabinets, to, you know, putting the forks and knives in it, the towels, the decorations.

It varied from cabin to cabin, from home to home. Some of the cabins I was full throttle on that he needed me a lot on to do decorations, pick out everything, all the interiors. He pretty much controlled and handled the infrastructure. And I would go in and do the girl stuff, you know, what color paint, what kind of cabinets, what color of carpet, the design of the carpet. You know, the railing. Are we going to have, you know, wood spindles or

scroll work spindles.

In 2007, Waddell obtained a real estate license. Waddell testified that she once secured a fifty thousand dollar ($50,000) excavation job for their business.

Waddell testified that, at the end of her relationship with Rustin, she searched for a home to purchase. Waddell wished to have a vehicle to show the bank in order to facilitate her purchase of a home. A payment contract signed by the parties included the language: "Becky Gribble [Waddell] shall retain use and ownership rights of the 2005 Chevrolet Tahoe." Waddell and Rustin dispute which party was to make the remaining loan and insurance payments on the Chevrolet Tahoe ("the Tahoe"). Rustin, however, made these payments and seeks to recover them from Waddell.

Dennis Young ("Young"), an electrical contractor who worked on four jobs on property at issue, testified that Waddell "picked most of the lights out" and "most of the painting was picked out by her." Young testified that interior paint in cabins consisted of "[j]ust staining the logs." Young also stated that he needed Waddell's approval to make certain decisions regarding lighting.

Debra McCarter ("McCarter"), a secretary/bookkeeper for a CPA, testified that she went to the Store once a month to pick up accounting work. McCarter stated that this activity occurred "whenever he opened through whenever he closed." McCarter testified that she often saw Waddell at the Store and that Waddell sometimes would hand over receipts. McCarter stated that her impression of Rustin and Waddell together was that "[t]hey were a couple." McCarter testified that the Store was originally a partnership between Rustin and his brother, but then became a sole proprietorship with Rustin as the sole proprietor.

Charlene Spurgeon ("Spurgeon"), Waddell's mother, testified that she saw Waddell at the Store "several times a week." Spurgeon stated that Waddell maintained a playpen at the Store for the children. Spurgeon testified that she and Waddell engaged in various activities related to the construction business. Spurgeon and Waddell went shopping at stores for items like linens and towels. Spurgeon stated that she went with Waddell to clean one cabin. Regarding Rustin, Spurgeon testified: "He was very good to Becky. He was very good to me and my daughter too. He was very good to us."

Rhonda Gribble ("Gribble"), Waddell's former mother-in-law, testified that she often saw Waddell at the Store. With respect to the construction business, Gribble testified that she saw Waddell at a construction project. Gribble stated that "I wouldn't see her doing anything, because we would be talking or something or - -." Gribble later stated that Waddell "was cleaning up where they had done some other items or whatever, like sawdust or

-4-

whatever, inside the house there." Gribble recalled staying at the construction project site for "an hour, maybe."

Officer Mark Self ("Self"), a trooper with the Tennessee Highway Patrol and Waddell's brother-in-law, testified that he saw Waddell at the Store several times. Self stated: "[Waddell] went to school and had her LPN, was working at a doctor's office at UT. At some point in time she quit her job there to work over at Mr. Rustin's store in Sevierville." Self testified that Rustin told Waddell that she should quit nursing and "work for him over there" instead.

Rustin was called as a witness. Rustin testified that he met Waddell when she was working at a convenience store and he was working at Dillard Smith. Rustin spoke to Waddell in the mornings when he stopped for fuel. Rustin testified that he never offered Waddell an interest or partnership in the Store. Rustin described the pattern of business at the Store:

> Yeah. She - - that's where, you know - - my store - - in Sevier County you do business through Friday. Friday is when - - most of our business is from out-of-town people. You do business on Friday and Sunday. They're coming in on Friday, they're leaving on Sunday. Nine times out of ten through the week you don't do any business, not with a store - - kind of store I had. But anyway, most of our people came in from out of town, they'd buy something we had at the store. Okay. Mrs. Gribble. That's where I was at. I would go there of the morning, open the store, if nobody shows up, boom, I'm gone doing something else. I would see Mrs. Gribble. She come [sic] to the store and see me.

Rustin also testified that he did not offer Waddell an interest in the excavation business. Rustin stated that Waddell had no property at the time they met. Rustin stated further that Waddell had no experience in construction or excavation when they met. Rustin had engaged in construction work for years. Rustin also testified that, prior to 1999, he had owned and operated a dump truck and backhoe.

Rustin testified regarding Waddell's contribution to the construction business:

> Becky - - out in - - all these numbers confusing everybody. There was a house I built in Majestic Meadows. There was a friend of mine, Jerry Kerley, he developed the whole subdivision. He invited me to an auction. I bought three lots from the man. He is actually the one. Mrs. Gribble was never present. Okay? I bought these lots, intentions [sic] to build a house on

them.  So I started building 555 Illinois Avenue.

You call a contractor up.  His name was Lynn.  He was a painter.  He brings things out to you, "Okay.  You like this color, this color?"  Yes, Becky did.  She picked out a color.  She was also in training to be a real estate agent, which is - - real estate agents tell you what looks good in a home so you can move the house.  This is true.  But I'm not going to take that from her.  She did do that.  She picked the colors out on that house.  And that's basically the lights, fixtures and all that.  I go - - I went and bought light fixtures also.

I would call Dave McNabb.  He is a friend of mine in Sevierville.  He owns an appliance discount.  Order from him appliances.  They bring it up.  It's all one thing in a cabin.  Houses are different than cabin [sic].  Cabin has no paint.  They have three coats of stain, which is call[ed] Sikkens coating.  They have no interior - - they have no - - the interior walls is actually the log itself.  Okay?

So I built one basic house plan in a cabin, a one-bedroom.  And the rest of them were two-bedrooms and they were identical houses.  Okay.

Regarding use of Waddell's checking account, Rustin stated that he did not have a personal checking account.  Rustin testified that Waddell would "write things out of her checking account" and he would reimburse her for it.  Rustin testified:

Q.     Are you aware of any commission check that Becky received being cashed and put in some slush fund or some fund of cash that she says you all kept together?

A.     No, sir.

Q.     Was Becky free to take cash whenever she wanted it?

A.     No, sir.

After the trial, in October 2010, the Trial Court entered a Final Judgment with findings of fact incorporated, finding and holding, *inter alia*:

It seems to the court reasonable over a period now - - we're talking about nine years, 1999 to 2008, when they separated.  We're talking about a lot of property, a lot of real property coming and going during that period of

-6-

time. I don't know how many parcels of real property, but several, several parcels of real property coming and going, a lot of personal property, coming and going during that period of time. And it seems to the court that had Ms. Gribble thought - - she really thought she was a partner, she would have - - there would have been something, something in writing somewhere. If not a contract between them, there would have been something showing, look, that out of the sale of this cabin, out of the sale of that cabin, out of the sale of the other house, out of the sale of whatever, there would have been some check or checks whereby her share of the money would have been distributed to her.

There is absolutely none. There is absolutely no check or distribution showing a 50/50 split or, for that matter, any other split to her out of assets that were sold during this relationship. That's one of the things that enters into the court's finding that there just is no evidence here to the standard of clear, cogent and convincing to the effect that Ms. Gribble was a partner with Mr. Rustin.

\* \* \*

Mr. Rustin had worked a lifetime in the construction business. He had worked privately since he was a teenager. He had worked for Bill Smith Construction Company doing construction type work. He had accumulated a lifetime's training and experience in the construction business. And the evidence here is that even though apparently he did not own construction equipment at the very time that he and Ms. Gribble met, he had prior to the time they did meet and he had operated an excavation business to some extent, at least to the extent of a four-wheel drive Case backhoe and a dump truck prior to the time that they met.

\* \* \*

The overall evidence, to me, I believe establishes that this was a boyfriend/girlfriend relationship, that it was not a partnership, that surely there was some - - there was evidence - - and I'm not saying at all that I find that Ms. Gribble didn't work. I believe she did. I believe she did work, at the Christmas store, at - - I believe she did. I believe she did do some work with respect to the cabins and so forth. But that by itself does not establish a partnership. Here you had a man and woman in a very close relationship. Though they didn't get married, they had a daughter together. And each was contributing to a household.

By the way, it was the way that - - Mr. Rustin's way of earning a living was to do what he knew how to do, and that was and is to do the excavation, to do - - conduct an excavation business, to conduct a construction business, to buy, sell and trade in land. And that's what he did. And that's how they paid the light bill, the water bill, the phone bill, the car payments, the - - bought Sea-Doos, bought motorcycles. But the point is, to the court, that they were doing what was necessary to maintain the household.

To be sure, they would have been better off to have had some written arrangement, some antenuptial agreement or some contract or some - - something in writing. They would have been far better off. But they didn't have it. And once again, unfortunately for Ms. Gribble, it's her burden to prove the partnership and her burden to prove it by clear, cogent and convincing evidence to the point that there is no substantial doubt. And I do not think the evidence - - as I've already said, I do not think the evidence here establishes that. Accordingly, the complaints will be dismissed.

The Trial Court further held regarding divestiture of certain property[2] from Waddell:

The problem is Mr. Rustin didn't have the burden of proof. The problem is Ms. Gribble had the burden of proof. And if she doesn't carry the burden of proof, he wins, which is what I've held. To the extent that he doesn't - - that she does not carry the burden of proof on anything that was at issue, to the extent she does not carry the burden of proof, he wins.

\* \* \*

No. The court holds that she was trying to establish a partnership here and has not carried the burden of proof to do it and, accordingly, those items belong to Mr. Rustin because she has failed to carry the burden of proof to show that she had a partnership interest in them.

The Trial Court held regarding payments on the Tahoe:

---

[2]Pursuant to the Final Judgment, the property at issue here includes: "all right, title and interest in the 2007 *Sea Doo* Jet Skis, serial numbers YDV62679E707 and YDV62666E707 John Deere Tractor, serial number LV3320H32007 and 07 Shoreland Trailer, serial number 1MDKNKK107A376765, and all other tools, equipment, trailers, motorcycles, ATVs, etc. (04 Honda JH2AEA03014K414164 and JH2DE0204J700217) acquired from 1999 through 2007…."

I don't believe [Rustin] ever said - - now, like I said, I'm no court reporter. I don't have it a hundred percent. But I don't believe he ever said that she agreed she was to pay the Tahoe off. In fact, he said he did himself pay it off. I know he said that.

* * *

His - - all right, title and interest in Mr. Rustin will be divested in him and vested in Ms. Waddell as to the Tahoe. It is clear from the payment contract, quote/unquote, that Becky Gribble shall retain use and ownership rights of the 2005 Chevrolet Tahoe.

Waddell appeals to this Court. We affirm, in part, and, reverse, in part.

**Discussion**

Though not stated exactly as such, Waddell raises two issues on appeal: 1) whether the Trial Court erred in finding that Waddell failed to prove that an implied partnership existed between Waddell and Rustin; and 2) whether the Trial Court erred in divesting Waddell of certain property. Though not stated exactly as such, Rustin raises two additional issues on appeal: 1) whether the Trial Court erred in not granting Rustin a judgment for the total amount he paid on a loan and insurance for the Tahoe; and 2) whether Waddell's appeal is frivolous.

In a non-jury case such as this one, we review the record *de novo* with a presumption of correctness as to the trial court's determination of facts, and we must honor those findings unless there is evidence which preponderates to the contrary. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to the trial court's factual findings. *Seals v. England/Corsair Upholstery Mfg. Co., Inc.*, 984 S.W.2d 912, 915 (Tenn. 1999). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

We first address whether the Trial Court erred in finding that Waddell failed to prove by clear and convincing evidence that an implied partnership existed between Waddell and Rustin. The Revised Uniform Partnership Act defines a "partnership" generally as "an association of two (2) or more persons to carry on as co-owners of a business or other

undertaking for profit . . . ."  Tenn. Code Ann. § 61-1-101(7)(2010).[3]  We have held that determining what constitutes a partnership is generally a matter of law, but whether a partnership exists under conflicting evidence is a question of fact.  *Wyatt v. Brown*, 281 S.W.2d 64, 68 (Tenn. Ct. App. 1955).  Because there was no written partnership agreement between Waddell and Rustin, Waddell bears the burden of proving the existence of a partnership by clear and convincing evidence.  *See Tidwell v. Walden,* 330 S.W.2d 317, 319 (Tenn. 1959); *Kuderewski v. Estate of Hobbs*, No. E2000-02515-COA-R3-CV, 2001 WL 862618, at *3 (Tenn. Ct. App. July 30, 2001), *no appl. perm. appeal filed*.

Our Supreme Court considered the issue of an implied partnership in the context of a man and woman who were romantically involved in *Bass v. Bass*, 814 S.W.2d 38 (Tenn. 1991).  In that case, the Court held that "the existence of a partnership may be implied from the circumstances where it appears that the individuals involved have entered into a business relationship for profit, combining their property, labor, skill, experience, or money."  *Bass*, 814 S.W.2d at 41 (internal footnote omitted).

In *Bass*, Linda Bass and William Bass dated for some time and then moved in together in 1975.  *Id*. at 39-40.  In 1976, Mr. Bass acquired a restaurant in a nearby town, and the couple moved there to operate the restaurant.  *Id*. at 40.  The Supreme Court summarized the couple's business activities in subsequent years as follows:

> The Plaintiff initially operated the restaurant by herself, working 17 hour days taking orders, cooking meals, cleaning, and running the cash register. . . . When William Bass began working at the restaurant, he and the Plaintiff each worked 12 hour shifts in order to keep the restaurant open 24 hours a day. Linda Bass was not compensated for her efforts at the restaurant, although she worked there extensively from 1976 to 1981, when the restaurant burned. During the time that Linda Bass worked at the restaurant, William Bass started a video amusement game business . . . .
>
> ***
>
> The Plaintiff would assist William Bass in the daily servicing of the video machines, help decide where new machines should be located, and kept most of the records of the various businesses. Although she was not listed as a partner or co-owner of any of the businesses, she wrote and signed most of the checks for the operation of the businesses, worked on the machines, and collected money from them (sometimes more than once a day). She was not

---

[3]The statutory definition of a "partnership" has remained the same since at least 2002.

paid a salary or wages for her efforts.

*Id*. The trial court concluded that Linda Bass and William Bass had an implied partnership. We reversed, but the Supreme Court reinstated the trial court's original judgment, finding that Linda Bass was entitled to half of the partnership assets upon the death of William Bass. *Id*. at 44. In doing so, the Supreme Court stated, "It was through the joint efforts of William Bass and Linda Bass that the businesses prospered. That prosperity was due in equal part to the effort of Linda Bass." *Id*.

The facts of the instant case are substantially different from the facts set forth in *Bass*. Rustin acknowledges, as do we, that Waddell performed certain work related to Rustin's business enterprises. However, it cannot be said of this case that the parties' prosperity was due in equal part to Waddell's efforts. Rustin and his brother ran the store prior to Waddell's relationship with Rustin. Waddell's work at the Store is better characterized as helping out rather than the contribution of an equal partner. Notwithstanding Waddell's activities related to certain houses or cabins, the record shows that Rustin, with his experience in construction and excavation, clearly was the primary driver of the construction enterprise. Waddell testified that she contributed no real property; personal property; money; formal training in interior design; excavation experience; or construction experience to any partnership.

While Waddell argues that tax returns from the relevant period demonstrate that Waddell was the primary provider at times, this argument fails to establish that an implied partnership existed between the parties. Likewise, the host of checks, purportedly for business purposes in part, written by Waddell and entered into the record fail to establish an implied partnership by clear and convincing evidence. The record instead shows that the parties in this case were engaged in a lengthy and close romantic relationship rather than an implied partnership.

We do not find that Waddell's activities either at the Store or construction business are sufficient to establish an implied partnership under Tennessee law. We agree with the Trial Court's conclusion that Waddell failed to satisfy her burden of establishing a partnership between herself and Rustin by clear and convincing evidence.

We next address whether the Trial Court erred in divesting Waddell of certain property. The Trial Court ordered:

2. That all right, title and interest in the 2007 *Sea Doo* Jet Skis, serial numbers YDV62679E707 and YDV62666E707 John Deere Tractor, serial number LV3320H32007 and 07 Shoreland Trailer, serial number

1MDKNKK107A376765, and all other tools, equipment, trailers, motorcycles, ATVs, etc. (04 Honda JH2AEA03014K414164 and JH2DE0204J700217) acquired from 1999 through 2007, be and are hereby divested out of Rebecca Gribble a/k/a Rebecca Gribble-Rustin and vested in Gregory Rustin.

As we have discussed, we agree with the Trial Court's conclusion that Waddell failed to prove the existence of a partnership. We, however, discern no basis for the Trial Court's divestiture of this property from Waddell. As there was no partnership, there was no basis to divest Waddell of this property. Waddell's failure to establish the existence of a partnership by clear and convincing evidence does not lead in any way to a conclusion that property which Waddell claimed was partnership property even though it was in her name was, instead, by some unknown method, transformed into Rustin's separate property. The fact that there was no implied partnership means that there is no partnership property. The fact that there was no implied partnership and thus no partnership property did not support the Trial Court's conclusion that this property in Waddell's name was instead Rustin's. We have reviewed the pleadings in this matter and found no prayer for such divestiture, and the evidence preponderates against the Trial Court's findings relative to this issue. Accordingly, we reverse the Trial Court's divestiture of property from Waddell to Rustin.

We next address Rustin's issue regarding whether the Trial Court erred in not granting him a judgment for the total amount he paid on a loan and insurance for the Tahoe. Waddell testified on this matter:

So on paper it was, you know, the bank was like, "Well, if you don't have a vehicle, then you're going to have to have a vehicle payment, so how much can you afford?" So he agreed to go have the paperwork drawn up saying that he would pay me the other 20,000 and that the vehicle would be mine so that on paper they could see that I had a vehicle.

Rustin testified that Waddell "was to assume the payments on the Tahoe." Rustin testified that he paid off the Tahoe and continued to make insurance payments for it. A contract entered as an exhibit at trial stated that Waddell would "retain use and ownership rights of the 2005 Chevrolet Tahoe." Rustin testified that the Tahoe was in his name. The record reflects that Waddell wanted a vehicle to show the bank in the course of her efforts to purchase a home. Apart from Rustin's testimony that Waddell "was to assume the payments" on the Tahoe, we see no evidence that Waddell accepted any obligation to make payments on the Tahoe's loan and insurance. We hold that the evidence does not preponderate against the Trial Court's findings with respect to this issue.

We finally address Rustin's issue regarding whether Waddell's appeal is

frivolous. " 'A frivolous appeal is one that is 'devoid of merit,' or one in which there is little prospect that [an appeal] can ever succeed.' " *Morton v. Morton*, 182 S.W.3d 821, 838 (Tenn. Ct. App. 2005) (quoting *Industrial Dev. Bd. of the City of Tullahoma v. Hancock*, 901 S.W.2d 382, 385 (Tenn. Ct. App. 1995)). Exercising our discretion, and in light of Waddell prevailing, in part, we decline to hold this appeal frivolous.

## Conclusion

The judgment of the Trial Court is affirmed, in part, and, reversed, in part, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed one-half against the appellant, Rebecca Gribble Waddell, and her surety, if any; and one-half against the appellee, Gregory C. Rustin.

_____
D. MICHAEL SWINEY, JUDGE